AO 106 (Rev. 5/85) Affidavit for Search Warrant

# United States District Court

## MIDDLE DISTRICT OF ALABAMA

2019 JUL 11 ꟼ 5: 21

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

A BLUE PORSCHE PANAMERA, VIN NUMBER WP0AA2A7XKL100410 (FURTHER DESCRIBED IN ATTACHMENT A)

DE___ ___ HACKETT CLK

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: 3: 19mj 214-SmD

I, _____ Nicholas Del Toro _____ being duly sworn depose and say:

I am a(n)  Special Agent with the Federal Bureau of Investigation _____ and have reason to believe
Official Title

that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

A BLUE PORSCHE PANAMERA, VIN NUMBER WP0AA2A7XKL100410 (FURTHER DESCRIBED IN ATTACHMENT A)

in the _____ Middle _____ District of _____ Alabama _____
there is now concealed a certain person or property, namely (describe the person or property)
See Attachment A

which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

(1) evidence of a crime; (2) contraband, fruits of crime, other items illegally possessed; or (3) property designed for use, intended for use, or used in committing a crime;

in violation of Title _____ 21 _____ United States Code, Section(s) _____ 841(a)(1) and (2) _____
The facts to support the issuance of a Search Warrant are as follows:

See attached affidavit incorporated herein by reference and made part of this application.

Continued on the attached sheet and made a part hereof.          ☒ Yes          ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

JULY 11, 2019 _____          at          MONTGOMERY, ALABAMA
Date                                                     City and State

HON. STEPHEN M. DOYLE
UNITED STATES MAGISTRATE JUDGE _____
Name and Title of Judicial Officer                        Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

2019 JUL 11  P 5: 21

IN THE MATTER OF THE SEARCH OF
THE PREMISES LOCATED AT 2127
EXECUTIVE PARK DRIVE, OPELIKA,
ALABAMA 36801

Case No. 3: 19mj 214 SMD

UNDER SEAL

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Nicholas Del Toro, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for the issuance of a warrant to search the vehicle registered to Orr Motors in Destin, Florida and leased by Dr. James H. Edwards, and located in the parking lot of the medical offices of James H. Edwards, also known as Analytic Options, P.C., also known as "Analytical Options Inc.," located at 2127 Executive Park Drive, Opelika, Alabama 36801, such vehicle being a blue Porsche Panamera, VIN number WP0AA2A7XKL100410 (further described in Attachment A), in order to seize fruits, instrumentalities, and evidence related to possible violations of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 1347.  There is probable cause to believe that fruits, instrumentalities, and evidence of these crimes (further described in Attachment B) will be found in a search of the premises.

2.      I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.      I, Nicholas Del Toro, am a Special Agent with the Federal Bureau of Investigation (FBI), and has been since 2009.  I am currently authorized to investigate matters involving drug trafficking, including violations of Title 21 Unites States Code 841.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  In connection with drug trafficking investigations, I have participated in and/or executed numerous search warrants, including residences of drug traffickers/manufacturers and their co-conspirators/associates, stash houses used as storage and distribution points for controlled substances.  As part of my training and experience, I am aware that certain controlled substances are often abused and illegally diverted from what would otherwise be considered legitimate medical uses.  I also know that individuals who abuse these types of drugs are at risk for becoming physically dependent on the drugs.  I have investigated and assisted with the investigation of individuals and organizations that illegally disburse or dispense controlled substances under the guise of operating seemingly legitimate medical clinics (colloquially known as "pill mills").

4.      The facts in this affidavit come from my personal observations, training, and experience, as well as information obtained from other agents and witnesses.  Since this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact obtained during the investigation.  This affidavit is only intended to show merely that there is sufficient probable cause for the requested warrant and does not show all of the facts, circumstances, and knowledge of the matters at hand.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the federal offenses outlined and described below in this affidavit have been committed by Dr. James Henry Edwards.  There is probable

2

cause to believe that evidence of such offenses, as described in Attachment B, will be found at the premises described in Attachment A.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested because the property to be searched is located within the district.  See Fed. R. Crim. P. 41(b)(1).

## RELEVANT PRVISIONS

7.      Based on my training and experience, and the training and experience of other DEA diversion investigators, special agents, and other law enforcement officers, I know that:

        a.      Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person knowingly or intentionally to distribute or dispense a controlled substance except as authorized by that subchapter.

        b.      Pursuant to Title 21, United States Code, Section 822(a)(1) and (a)(2), and 21 C.F.R. § 1301.11 and other regulations, a person who distributes or dispenses any controlled substance, or who proposes to dispense any controlled substance, must obtain a registration from the DEA every three years.

        c.      Under 21 C.F.R. § 1306.03, a prescription for a controlled substance may only be issued by a practitioner who is both authorized to prescribe in the jurisdiction in which she is licensed to practice her profession and registered with the DEA (unless otherwise exempt from registration).

        d.      Under 21 C.F.R 1306.3(a)(1) and (2) and 21 C.F.R. § 1306.4(a), a prescription for a controlled substance is only valid if it has been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.  If a physician—even a holder of a DEA registration—issues a prescription and that prescription does

3

not satisfy the above-recited criteria, then the prescription constitutes an unlawful distribution and dispensing of a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

      e.      Title 18, United States Code, Section 1347 makes it a crime to defraud a health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, the money or property owned by, or under the custody or control of, any health care benefit program.

      f.      The Alabama Board of Medical Examiners (ABME) requires that a physician maintain a patient's complete treatment records (including evaluations, diagnoses, and prognoses) for a period of no less than ten years from the patient's last visit.

## PROBABLE CAUSE

**A.    Background Information**

8.      The DEA, FBI, and other law enforcement agencies are investigating James Henry Edwards. Edwards is a physician licensed to practice medicine in Alabama and Connecticut. Edwards currently operates two psychiatric clinics in Alabama. One of those clinics is located at 2127 Executive Park Drive, Opelika, Alabama 36801. The other is located at 229 East 20th Avenue, Suite 10, Gulf Shores, Alabama 36542.

9.      I also know that Edwards operates these two clinics as part of a business incorporated through the office of the Alabama Secretary of State on or about October 11, 2011. That business, Analytic Options, P.C. (Analytic Options) is a domestic professional corporation formed to conduct "all lawful business." According to records of the Alabama Secretary of State, Edwards is the incorporator and the only director of Analytic Options.

10.      Additionally, I know that, pursuant to licenses he has with the DEA and the Alabama Board of Medical Examiners (ABME), Edwards is authorized to prescribe Schedule II,

4

III, IV, and V controlled substances.  He must do so for legitimate medical purposes and within the normal course of his psychiatric practice.

## B.    Edwards's Background

11.    I have reviewed records from the ABME and other governmental regulatory agencies.  Based on my review of this information, I have a general understanding of the history of where Edwards has practiced.

### 1.    Montgomery, Alabama Analytic Options Practice

12.    On or about November 28, 2010, Edwards submitted his first application for an Alabama medical license.  At that time, Edwards resided in Roxbury, Connecticut.  The ABME issued that license to Edwards on or about January 1, 2011.  The first practice location Edwards registered with the ABME was 1040 Longfield Court, Montgomery, Alabama 36117.

13.    In late 2011, Edwards renewed his Alabama medical license.  When he did so, he reported that his practice location had changed to 7956 Vaughn Road, Suite 301, Montgomery, Alabama 36117.  Around that same time, Edwards filed documents with the Alabama Secretary of State to create a business entity—Analytic Options, P.C. (Analytic Options).  On the incorporation documents, Edwards listed Analytic Options's address as 7956 Vaughn Road, Suite 301, Montgomery, Alabama 36116.  Edwards listed himself as the sole incorporator of Advance Options.  It is my understanding that Edwards operated his Montgomery practice under the Analytic Options business.  I know that at some unknown time before 2017, Edwards stopped practicing in Montgomery.

### 2.    Opelika, Alabama Grandview Behavioral Health Center Practice

14.    Starting in 2011, Edwards began to practice in both Montgomery and Lee Counties.  I know from records that, in or around 2011, Edwards worked as an independent

5

contractor at Grandview Behavioral Health Center, located at 2123 Executive Park Drive, Opelika, Alabama 36801. Grandview Behavioral Health Center was a mental health practice group located in Opelika and affiliated with Mountain View Hospital of Gadsden, Alabama. At this facility, Edwards provided psychiatric evaluations and medication management.

15.     When Edwards submitted his 2015 license renewal form to the ABME, he listed Grandview Behavioral Health Center as his primary practice location. I know that Edwards stopped practicing at Grandview Behavioral Health Center in or around 2018.

    **3.     Fairhope, Alabama East Bay Psychiatry Practice**

16.     At some point, Edwards began to practice on a part-time basis at East Bay Psychiatry, located at 761 B Middle Street, Fairhope, Alabama 36532. Edwards remained at East Bay Psychiatry from an unknown time and continuing until in or about February of 2017.

    **4.     Opelika, Alabama Analytic Options Practice**

17.     At some point, Edwards moved his Analytic Options practice from Montgomery to Opelika. By at least 2017, Edwards practiced on Thursdays and Fridays at the Opelika location described above—2127 Executive Park Drive.

18.     Edwards continues to practice in this location. I know this because:

    a.     On May 2, 2019, an investigator working with me conducted surveillance at 2127 Executive Park Drive. The investigator observed signage at the facility bearing Edwards's name. The investigator also saw Edwards come and go from the facility in a silver Porsche.

    b.     On May 9, 2019, an investigator working with me again conducted surveillance at 2127 Executive Park Drive. The investigator observed the same signage. He also saw Edwards coming and going in a silver Porsche.

6

c. On June 20, 2019, an investigator working with me again conducted surveillance at 2127 Executive Park Drive. The investigator observed the same signage. He also saw Edwards coming and going in the blue Porsche that is the premises of this affidavit.

d. On July 11, 2019, an investigator working with me conducted surveillance at 2127 Executive Park Drive before the execution of the search warrant for Dr. Edwards's office at that location. The investigator observed Edwards arrive in the blue Porsche that is the premises of this affidavit and enter his clinic.

19. Based on my training and experience, I think that it is likely that evidence— consisting of medical records, appointment books, sign-in sheets, banking documents, and billing records—are maintained in the above-described Opelika office. It is my experience that medical practices typically keep such records on site in either physical or electronic format. Medical records are the primary means by which law enforcement can determine whether a particular prescription was or was not for a legitimate medical purpose and within the scope of normal medical practice. Moreover, financial records provide evidence of a physician's motive for unlawfully prescribing.

### 5. Gulf Shores, Alabama Analytic Options Practice

20. In or around February of 2017, Edwards stopped practicing at East Bay Psychiatry and opened in Gulf Shores a branch of Analytic Options. He did so at the location described above—229 East 20th Avenue.

21. Edwards continues to practice at this location. I know this because, on or about October 27, 2017, the ABME received a letter signed by Edwards and dated October 16, 2017. In that letter, Edwards wrote, "I began seeing patients for Analytical Options Inc [sic] at 229 20th

7

Street Suite 10 Uptown Plaza Gulf Shores, AL 36542 approximately the end of January to beginning of February 2017."

## C.     2016 Complaint

22.     Based on my review of DEA records, DEA received a complaint about Edwards on or about April 20, 2016. On that date, a physician contacted the DEA and reported that he (the physician) works with Edwards and that Edwards was prescribing large amounts of benzodiazepines. The physician speculated that Edwards may have himself been taking drugs. Due to the age of the tip, I have no further information about the tip.

## D.     Pharmacy Complaints

23.     During the first half of 2019, investigators working with me contacted various pharmacists and employees of pharmacies located in and around Opelika and those in and around Gulf Shores. Those individuals reported concerns regarding the prescriptions Edwards had issued that customers had brought to their pharmacies for filling.

24.     I know from my training and experience that pharmacy employees have a duty to report to refrain from filling prescriptions known by the pharmacy employees to be illegitimate. I also know that pharmacy employees receive training on identifying illegitimate prescriptions. Things that pharmacy employees look for include: (1) whether the pharmacy is filling a large number of prescriptions for controlled substances from the same physician; (2) whether the pharmacy employee notes that the same physician is repeatedly prescribing the same combinations of controlled substances; and (3) whether the pharmacy employee observes that the physician is prescribing hazardous combinations of controlled substances.

25.     For this reason, I consider pharmacy employees to be reliable sources of information in investigations of prescribers of controlled substances.

8

## 1. Opelika Pharmacists

26. The following summarizes the information the investigators working with me received from the various Opelika pharmacists:

a. Sarah Britton of the Kroger pharmacy (2460 Enterprise Drive, Opelika, Alabama) reported that Edwards was prescribing a lot of "Benzos" and that she had seen Edwards prescribe as many as three different benzodiazepines to the same patient at the same time. Britton also reported that Edwards prescribed high quantities of attention deficit-hyperactivity disorder (ADHD) medications, such as dextroamphetamine-amphetamine (commonly known by its brand name version, "Adderall") and lisdexamfetamine (commonly known by its brand name version, "Vyvanse"). According to Britton, in 2018, she telephoned Edwards and questioned him regarding his prescribing practices. Edwards instructed her that his patients needed the medications he prescribed.

b. Margaret Thompson of CVS pharmacy (1997 Pepperell Parkway, Opelika, Alabama) stated that Edwards seemed to be prescribing the same medications—Adderall, Vyvanse, alprazolam (commonly known by its brand name version, "Xanax"), and clonazepam (commonly known by its brand name version, "Klonopin"). She noted that Edwards often prescribes multiple benzodiazepines on the same prescription. On one occasion, Edwards called the pharmacy to authorize an early refill of a prescription. Based on concerns regarding Edwards's prescribing, the CVS pharmacy no longer accepts new Edwards patients and does not authorize early refills on Edwards prescriptions.

c. Glenn Williams of East Alabama Medical Center Apothecary (2200 East Pepperell Parkway, Opelika, Alabama) stated that Edwards prescribed large quantities of controlled substances.

9

        d.     Eddie Parker of Walgreen's pharmacy (2015 Pepperell Parkway, Opelika, Alabama) stated that Edwards prescribed large quantities of Adderall. Occasionally, Parker called Edwards and questioned his prescribing. Edwards always had reasons for his prescriptions, according to Parker.

        e.     Sherry Holley of Wal-Mart pharmacy (2900 Pepperell Parkway, Opelika, Alabama) reported that Wal-Mart has a corporate policy of not filling prescriptions for Edwards based on concerns regarding his prescribing practices.

        f.     Sabrina Wilder of CVS pharmacy (1498 Opelika Road, Auburn, Alabama) reported that Edwards prescribes "multiple benzos to the same patients." Wilder said that she had called Edwards's office many times to question prescriptions. When she did so, she was told not to "question the doctor." Wilder also said that she knew of at least one patient of Edwards who was in drug rehabilitation. Additionally, according to Wilder, one of Edwards's patients told her that Edwards instructed him to pay cash for his prescription so as to get around a law regulating prescriptions. Wilder could not remember this patient's name.

        g.     Dianna McNay of Kroger pharmacy (300 North Dean Road, Auburn, Alabama) said that Edwards prescribes "benzos for most of his patients."

        h.     Katelyn Williams of Walgreens pharmacy (765 East Glenn Avenue, Auburn, Alabama) reported that they frequently had to call Edwards's office because information was omitted from prescriptions. On one occasion, Edwards's speech was slurred.

        i.     Brittany Boos of CVS pharmacy (770 East Glenn Avenue, Auburn, Alabama) noted that it was a running joke in the office that college students went to get prescriptions from Edwards. She said that Edwards gave patients multiple benzodiazepines at the same time.

10

j.      Jeff Jerkins of Bubba's Medicine Shop (512 2nd Avenue, Opelika,

Alabama) said that Edwards would prescribe "a lot of Benzos to the same patients." He added

that all of Edwards's patients would be on the same prescriptions.

### 2.      Gulf Shores Pharmacists

27.      The following summarizes the information the investigators working with me

received from the various Gulf Shores pharmacists:

a.      A pharmacist at the Walgreen's pharmacy (1421 Gulf Shores Parkway,

Gulf Shores, Alabama) reported that Edwards was prescribing multiple "Benzos" on the same

prescriptions to patients.

b.      Blake Shoemaker of Wal-Mart pharmacy (170 East Fort Morgan Road,

Gulf Shores, Alabama) stated that Edwards was prescribing multiple "Benzos" on the same

prescriptions. He noted that Wal-Mart's corporate policy was not to fill Edwards's prescriptions.

c.      Evan Tomlinson of Publix pharmacy (160 Cotton Creek Drive, Suite 100,

Gulf Shores, Alabama) said that Edwards was seeing a high volume of patients and prescribing

large amounts of medications. Tomlinson said that he had previously worked at a Publix

pharmacy in Auburn and had seen the same sorts of problems with Edwards's prescriptions

there.

d.      Linda Caylor of CVS pharmacy (3820 Gulf Shores Parkway, Gulf Shores,

Alabama) reported that she found mistakes on many prescriptions Edwards wrote. She also

stated that she saw Edwards prescribing excessive amounts of medication.

### E.      Informant Interviews and Investigation

28.      Next, another law enforcement agency working with the DEA received

information from two former patients of Edwards. Those patients were Amber Williams and Eli

11

Bedsole. The following summarizes the information provided by Williams and Bedsole, as well as follow-up investigation regarding that information.

**1. Amber Williams**

29. On May 16, 2019, two investigators working with me telephonically interviewed Williams. Williams told those investigators that she saw Edwards after her boyfriend, Bedsole, recommended Edwards to her.

30. According to Williams, she saw Edwards only one time. The visit, occurring December 13, 2018, was brief—she was with Edwards for only 15 minutes. During those 15 minutes, Edwards asked Williams about her family history. Williams told Edwards that she was adopted. She also told Edwards that she had previously been addicted to Ecstasy and Adderall. Williams explained to Edwards that she was seeing him due to anxiety and panic attacks. She said that, when confronted with these symptoms before, she had taken Klonopin. However, Klonopin had not helped her. At the conclusion of the session, Edwards prescribed Williams 60 2-milligram Xanax tablets and instructed her to take one pill twice per day.

31. Thereafter, Williams filled her prescription. She then proceeded to take 50 pills in three days. This overdosing resulted in Williams being hospitalized for almost a week. Williams spent three of those days in the intensive care unit. When she was released from the hospital, Williams telephoned Edwards and told him about the overdose. Edwards asked Williams for her discharge papers, but Williams refused to provide him with those. Williams concluded the call by telling Edwards that she would not be seeing him again and did not want to continue on the medication.

32. Soon after she got off of the telephone with Edwards, Williams received a text message from the Publix pharmacy. The message said that her prescription for diazepam

12

(commonly known by its brand name version, "Valium") was ready. Confused, Williams called the pharmacy to ask about the text message. The pharmacist told Williams that Edwards had called in the prescription for her. Williams did not fill the prescription. She confirmed to an investigator working with me that she never discussed with Edwards diazepam or obtaining another prescription.

33.     Following up on this information, an investigator working with me then contacted the Publix pharmacy at issue. The pharmacist provided the investigator with copies of two prescriptions. The first was the December 13, 2018, the prescription Edwards issued to Williams for 60 2-milligram Xanax tablets. The second was a copy of a telephoned prescription for one 5-milligram diazepam pill. The copy appeared to reflect that Edwards had called the prescription into the pharmacy on December 22, 2018.

### 2.     Eli Bedsole

34.     On May 15, 2019, investigators working with me interviewed Bedsole. Bedsole stated that he started seeing Edwards around the middle of 2018. He did so because he was experiencing anxiety and panic attacks. The first time he went to Edwards, Edwards asked, "Would you like Xanax?" Bedsole declined, explaining to Edwards that he had previously taken Xanax and had "issues" with the drug. Instead, as best as Bedsole could recall, Edwards prescribed him two non-controlled medications during that first visit. Bedsole said that he took those drugs for some time and then concluded that they were not helping him.

35.     After some time, Bedsole returned to Edwards's office and requested Xanax. Edwards gave him a prescription for 1-milligram dosages of the drug. Eventually, Bedsole asked that Edwards increase the dosage to 2 milligrams. Edwards did so without asking Bedsole for any reason for the increase in dosage.

13

36.     According to Bedsole, he saw Edwards approximately 10 times. During each of his first two visits, Bedsole spent around 45 minutes with Edwards. After that, the visits typically lasted between five and ten minutes.

37.     Bedsole said that he frequently saw patients in Edwards's office asking for prescriptions. He remembered one female patient who was visibly shaking as she asked Edwards for a new Adderall prescription.

**F.     ABME Subpoena Response**

38.     Additionally, investigators working with me served a grand jury subpoena on the ABME. The subpoena requested all records in the ABME's possession related to Edwards. The records received in response to the subpoena showed that, in 2017, the ABME began an investigation of Edwards. The materials generated during that investigation included the following:

**1.     Medical Records**

39.     As part of its investigation, the ABME subpoenaed from Edwards 12 patient files. In October of 2017, Edwards responded to the subpoena by providing the requested records. The records submitted included, for each patient: (1) progress notes prepared by Edwards regarding visits with the patient; (2) superbills prepared by Edwards or a member of his staff containing billing and diagnostic information about the visits; (3) treatment plans prepared by Edwards or members of his staff; and (4) copies of prescriptions signed by Edwards.

**2.     Expert Report**

40.     After interviewing Edwards, the ABME sent the medical records and other materials to an independent expert reviewer, Dr. Tarak Vasavada. Dr. Vasavada was, at that time, a Professor and Regional Chair of Psychiatry at the University of Alabama-Birmingham

14

(UAB) School of Medicine's Huntsville campus. He has since retired and now works at Huntsville Hospital.

41.     On April 26, 2018, Dr. Vasavada sent to the ABME his expert evaluation of the Edwards files. In 11 of the 12 files, Dr. Vasavada found excessive dosages of stimulant medications. In all 12 files, Dr. Vasavada identified inadequate documentation and incomplete records. Dr. Vasavada also pointed out that nowhere in the 12 files was there any indication that Edwards conducted a urine drug screen to ensure that patients were not diverting the prescribed medication or taking non-prescribed drugs. Ten of the 12 files reflected duplicate prescribing, that is, prescribing two medications from the same class of drugs to treat the same problem. Additionally, Dr. Vasavada noted that: (1) 8 of the 12 patients received hazardously high dosages of medications; (2) in 2 files, it was apparent that the patients were obtaining pain medications from other providers, however, in neither case did Edwards attempt to obtain records from those other providers; and (3) in 3 files, Edwards gave patients refills even though the patients did not see him for more than 3 months.

42.     Dr. Vasavada also included the following general statement:

[T]here are a number of concerns which, if found individually, would be worrisome, but which seen as a pattern are disturbing. These include the fact that nearly all [of] these patients are young, Patients are living a far distance from him but follow him. He is likely living in the Mobile area but went to Opelika to see patients and some of them have followed him back. Some patients are not asking for high doses and Dr. Edwards has increased the doses of stimulants or is prescribing sedatives with it. Notes do not reflect that Dr. Edwards is willing to negotiate with his patients if they can do equally well on a low dose. He does not justify the need for the high dose. Some notes may be missing from the charts. Taken together, such a pattern of facts is highly concerning for inappropriate prescribing and use of controlled substances.

43.     Dr. Vasavada also included specific comments about each file. The significant points in those evaluations are as follows:

15

a.        Vickie A. – seen by Edwards at the Opelika Grandview Behavioral Health Center clinic and prescribed dextroamphetamine and alprazolam by Edwards – Edwards's notes are "barely minimal" with no justification for increasing Adderall dosage.  Adderall dosage seems excessive for patient's weight.  No specific symptoms of any of the diagnoses.  No substance abuse evaluation or drug screen.

b.        Max C. – seen by Edwards at the Opelika Grandview Behavioral Health Center clinic and prescribed by Edwards dextroamphetamine – Adderall dose is nearly twice recommended, and patient was not seen for nearly a year, yet still managed to obtain medications at the high dosage.  Adderall is increased, even though patient is doing well, and there is no justification for increase.  Notes are of low detail.  Another person writes the last few notes, although the note bears Edwards's signature.  No EKGs, labs, or drug screens performed even though patient is on high dose.

c.        Robert C. – seen by Edwards at the Grandview Behavioral Health Center clinic and prescribed by Edwards methylphenidate, lisdexamfetamine, and dexmethylphenidate – Patient has no current diagnosis of ADHD, but has three stimulants prescribed. No labs, EKG, or drug screens.  Two other psychologists wanted to wean the patient off meds, then restart to see if needs had changed, but Edwards did not feel the need to do that.

d.        Ashley C. – seen by Edwards at the Fairhope East Bay Psychiatry practice and the Gulf Shores Analytic Options practice and prescribed by Edwards diazepam, clonazepam, and hydrocodone – Poor documentation. Two antianxiety medications without justification.  No drug screen.  Two benzodiazepines prescribed at the same time and no mention of that risk.  Soma and Tylenol #3 from another provider, which Edwards has not reconciled.

16

Additionally, Edwards prescribed this patient hydrocodone—a Schedule II opioid pain medicine. It is unclear from the chart why a psychiatrist would do so.

      e.      Nicole F. – seen by Edwards at the Fairhope East Bay Psychiatry practice and the Gulf Shores Analytic Options practice and prescribed by Edwards dextroamphetamine, lisdexamfetamine, and alprazolam – Poor documentation. Notes say nothing about why there are two ADHD meds and two anxiety meds. Edwards went up to 2 milligrams of Xanax without tapering. No drug screen. Edwards prescribed buprenorphine—an opioid often prescribed for pain or to treat opioid dependency. However, there was no mention of the buprenorphine prescriptions in the chart.

      f.      Dara G. – seen by Edwards at the Fairhope East Bay Psychiatry practice and the Gulf Shores Analytic Options practice and prescribed by Edwards dextroamphetamine – High medication dose, no drug screen or EKG. Poor documentation including why dosages were increased.

      g.      Matthew H. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dextroamphetamine, clonazepam, lorazepam, and alprazolam – Stimulant dose is much higher than it should be, no documentation about why Adderall was added. When patient claimed to have his meds stolen, there was no drug screen. No reasoning as to why two benzos were prescribed and why the dosage is so high.

      h.      Adam P. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dextroamphetamine, alprazolam, zolpidem, diazepam, and hydrocodone – No explanation given for prescribing 140 mg. per day of stimulants. No explanation is given for increasing dosages of stimulants or benzodiazepines. Failure to conduct EKGs, which would have been appropriate given the high dosage of stimulants prescribed.

i.    Jared S. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dextroamphetamine – Poor documentation regarding reasoning for higher than FDA recommended dose. No drug screen, no labs, no EKG.

j.    Melissa S. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dexmethylphenidate and diazepam – No ADHD assessment, poor documentation. Higher than daily recommended dose of Foucalin. No drug screen.

k.    Robert S. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dexmethylphenidate and methylphenidate – No justification for medications. Patient was not seen from 2014-2016, yet still maintained medications. No labs.

### 3.    Settlement Agreement

44.    After receiving the expert's report, on May 16, 2018, the ABME issued to Edwards an order to show cause. The order alleged that Edwards excessively prescribed controlled substances and required that Edwards show cause as to why his license should not be revoked.

45.    Thereafter, in January of 2019, Edwards and the ABME entered into a joint stipulation. The settlement agreement permitted Edwards to persist in his denial of the excessive prescribing allegations. However, Edwards agreed to do the following: (1) use stimulants to treat only ADHD, and not other conditions; (2) limit the daily dosages of all controlled substances; (3) refer to another psychiatrist any patient whose dosage Edwards cannot successfully reduce; (4) utilize urine drug screens; (5) refrain from prescribing controlled substances for weight loss, narcolepsy, sleep apnea, or fatigue; and (6) attend a course on medical recordkeeping and prescribing controlled substances.

### 4.    New Complaint

18

46.     Approximately three months after the ABME and Edwards entered into the settlement agreement, the ABME received a new complaint about Edwards.  This complaint came from Auburn resident Dawn Pierce.  Pierce alleged that her son, Taylor Pierce, 29, had been a patient of Edwards's before taking his life on November 11, 2018.  According to Dawn Pierce, she believed that Taylor Pierce "was addicted and abused Xanax, all legally obtained by prescriptions from Dr. Edwards."

47.     Dawn Pierce stated that, the week before Taylor Pierce passed away, Dawn Pierce contacted Edwards's office regarding Taylor Pierce's "erratic behavior."  Dawn Pierce had previously written letters to Edwards stating that she suspected that Taylor Pierce was abusing drugs.  The Friday before his death, Taylor Pierce saw Edwards.  He obtained a prescription for Xanax.  Two days later, Taylor Pierce committed suicide.

48.     According to the complaint, other psychiatrists who treated Taylor Pierce questioned the high dosages of Xanax Edwards prescribed.  However, Taylor Pierce—addicted to the medication—kept returning to Edwards.  Dawn Pierce considered Edwards's prescribing practices a contributing factor in Taylor Pierce's death.

**G.     Online Comments**

49.     During the investigation, I and other investigators accessed online comments posted on physician-review websites, namely vitals.com, healthgrades.com, and google.com.  In doing so, investigators found comments about Edwards posted by individuals who purported to have been Edwards's patients.  I should note that these comments are anonymous and I have no way of verifying whether or not the commenters were in fact Edwards's patients.  Nevertheless, some of the comments I found were as follows:

          a.      Posted on healthgrades.com on June 16, 2019: "I'd been seeing him for several years, and in that time he would increase my medication without me asking or expressing concern over my dosage. After a year he had me taking a very high daily dose of a controlled substance. He never showed much interest in talking to me, rather he would just start writing my prescription and send me on my way. In April 2019 I went in for my regular appointment and he told me he could no longer see me. He recommended I have my primary care doctor continue to prescribe the medication at the same high dose. No primary care doctor in their right mind would continue Dr. Edwards' regimen! I received a letter a few days later saying my situation was "too complex" for him to continue to see me as a patient. Not only did he leave me high and dry with a drug dependence that he initiated, but he also implied that it was my fault he was firing me as a patient. I see here that his license to prescribe controlled drugs has been suspended. Good riddance!"

          b.      Posted on healthgrades.com on February 25, 2019: "Beware of overmedication."

          c.      Posted on healthgrades.com on April 12, 2019: "His caseload -- about 20-30 patients per day -- leaves him without any deep understanding of any single patient. Grandview is a pill mill although he recently left and went out on his own so maybe he will lessen his caseload. He seems distracted and not caring. What is the point of telling your life to someone who is distracted? He divides his time between Gulf Shores (yaay, rich people) and Opelika, now. I give two stars because he has, in fairness, prescribed some helpful meds."

          d.      Posted on healthgrades.com on March 30, 2017: "He didn't even read my case sheet before he sat me down in his office so he was unprepared. He basically said I should lose some weight and get a dog and that was all I needed to get over my depression... I could

20

have saved my time and gas if he was just going to make me feel more depressed .... If my therapist Mrs Barbara wasn't nice and knowledgeable I would never set foot inside grandview ever again!"

          e.     Posted on vitals.com on June 13, 2019: "Overmedicated me. I almost died."

          f.     Posted on vitals.com on June 1, 2019: "Going to be detoxed in rehab because of his critical mistake of giving me massive dosages of ATIVAN for 5 years. GOD HELP ME."[1]

          g.     Posted on vitals.com on January 4, 2019: "Staff mean and he just runs a pill mill...Don't recommend him at all!!"

          h.     Posted on vitals.com November 7, 2017: "My daughter came home with 5 meds and not at beginning dosages.... My pharmacy thankfully advised me. Told me to speak with Dana, She is no longer there... Of course. HELP."

          i.     Posted on google.com in June of 2019: "He doesn't care about his patients at all his only concern is that the DEA doesn't shut down his practice. I don't know what he has been doing to draw the attention but obviously   he has been doing something unethical, to which his solution has been to cut patients off their medicine and say good luck. Some of these medicines can have drastic effects if abruptly stopped such as suicide and seizures. Just got with my lawyer am filing a Malpractice suit. If anyone else has been a victim of Dr. Edwards you could consider."

## H.    Meeting with Medical Expert

---

[1]Ativan is a brand-name version of lorazepam. Lorazepam is a Schedule IV benzodiazepine commonly used to treat seizure disorders. It can also be used to treat anxiety.

21

50. On June 18, 2019, agents met with Dr. Vasavada—the expert physician retained by the ABME to review Edwards's patient files. During that meeting, Dr. Vasavada stated that, based on his review of the files, Edwards issued prescriptions for controlled substances outside the normal course of professional medical practice and for no legitimate medical purpose. Specifically, Dr. Vasavada found that the following prescriptions given to the following patients on or about the following dates were illegitimate.

| PATIENT | DATES OF TREATMENT | CONTROLLED SUBSTANCES PRESCRIBED ILLEGITIMATELY |
|---|---|---|
| Matthew H. | October 23, 2013 through September 7, 2017 | Dextroamphetamine, clonazepam, lorazepam, and alprazolam. |
| Robert C. | October 20, 2016 through September 12, 2017 | Methylphenidate, lisdexamfetamine, and dexmethylphenidate. |
| Adam P. | April 22, 2013 through July 21, 2017 | Dextroamphetamine, alprazolam, zolpidem, diazepam, and hydrocodone. |

I know from Edwards's records that Edwards saw each of these patients and distributed prescriptions to each patient at his Opelika clinic, within the Middle District of Alabama.

**I.  Observation of the Vehicle's Interior**

51. On July 11, 2019, investigators executed a search warrant at Edwards's offices in Gulf Shores and Opelika. Before the search warrant was executed, investigators observed Edwards arriving at his Opelika office in the vehicle, parking it in a parking spot marked "Doctor's Reserved Parking Building 2127," and leaving it to go inside the clinic. After the

22

execution of the search warrant, I looked through the windows at the interior of the vehicle. There I observed two manila files appearing to be patient files, paperwork that appear to contain tax information, and documents labeled James H. Edwards Child Psychiatry. Also inside the vehicle's backseat was a folded prescription bag. I further observed a black and silver pistol in the driver's side door.

Pictures of the interior and exterior of the vehicle are set forth below.





24



25



## **ELECTRONIC DEVICES**

52.     As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the premises, in whatever form they are found, including but not limited to medical records for Edwards's patients.  One location where the records might be found is stored on a computer's hard drive or other storage media or smartphone, as described in Attachment B.

26

53.     Also, based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, a GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

54.     I submit that if a computer or storage medium is found on the premises, there is probable cause to believe the records described in Attachment A will be stored on that computer or storage medium, for at least the following reasons

a.     I know from my training and experience that computers are used in medical offices to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules and other information needed to operate a medical practice.

b.     Based on my training and experience investigating physicians, in almost every medical practice some manner of computer system is utilized, whether to manage patient medical records, save prescription histories, or handle patient billing needs, and thus there is reason to believe that there is a computer system currently located on the premises, and that the computer system is storing evidence related to the offenses under investigation.

55.     This application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

27

56.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well, including:

a.     Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner. Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the presence of other things found on the storage medium.

29

I mention the possible existence of malicious software as a theoretical possibility, only; I will not know, until a forensic analysis is conducted, whether malicious software is present in this case.

57.     Searching storage media for the evidence described in Attachment B may require a range of data analysis techniques.  It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant.  In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the warrant are immediately apparent.  In most cases, however, such techniques may not yield the evidence described in the warrant.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

58.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a.     The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b.     The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to

31

know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

              d.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

        59.      In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in this warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence. If computers or other digital devices are found in a running state, I am requesting that the agents be authorized to acquire evidence from the devices prior to shutting the devices off. In addition, in the execution of this warrant, the agents may seize all computers and computer-related media to be searched later by a qualified examiner in a laboratory or other controlled environment.

## CONCLUSION

        60.      Based upon the foregoing and upon my training and experience, I submit that there is probable cause to believe that the premises described as the vehicle driven by Dr. James Henry Edwards contains fruits, instrumentalities, and evidence related to possible violations of Title 21, United States Code, Section 841(a)(1), to wit, prescribing controlled substances outside the course of professional practice and without a legitimate medical purpose and Title 18, United States Code, Section 1347, to wit, health care fraud.

32

Respectfully submitted,

Nicholas Del Toro
Special Agent, Federal Bureau of Investigation

Sworn to before me this
11th day of July, 2019.

STEPHEN M. DOYLE
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF ALABAMA

## ATTACHMENT A

### Premises To Be Searched

The premises to be searched is the vehicle registered to Orr Motors of Destin, Florida, and leased by Dr. James H. Edwards, and located in the parking lot of the medical offices of Dr. James H. Edwards, located at 2127 Executive Park Drive, Opelika, Alabama 36801, such vehicle being a blue Porsche Panamera, VIN number WP0AA2A7XKL100410, and all electronic devices, containers, computer systems, or other data storage mechanisms found within that vehicle. The vehicle is depicted below.

## ATTACHMENT B

### Particular Things to be Seized

All records and other evidence relating to violations of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 1347.

1.      Original patient and medical records (in paper and electronic form).  Patient records may contain, but are not limited to, the following information: referring physician or documentary information regarding which health care professional provided or prescribed items or services and the items or services provided or prescribed, physician's orders or prescription information, insurance verification forms, patient sign-up/sign-in sheets, patient lists, intake sheets, authorization forms, Certificates of Medical Necessity, face sheets, correspondence, Medicare beneficiary assignment of benefits, and coinsurance information.

2.      Any internal or source document, regardless of form used, in the preparation or submission of health insurance claims for patients seen by Edwards.

3.      Any and all training materials, manuals, patient lists, marketing materials, policies or directives related to the administration of or billing, acceptance of payment for or medical procedures applicable to employees, agents, independent contractors, or representatives in the performance of their duties.

4.      Any and all correspondence memoranda, contracts, agreements, reports of conversation, invoices, and notes between Edwards and his employees, agents, contractors, vendors, and representatives relating to the administration of billing or accepting payments for medical procedures.

5.      Receipts, ledgers, bank records, address and telephone books, appointment books, safe deposit receipts and keys, credit card or debit cards and statements or any other documents relating to the illegal distribution of controlled substances or the proceeds thereof.

6.      Currency and other monetary instruments or other items which are the proceeds of the illegal distribution of controlled substances.

7.      Unauthorized controlled substances.

8.      Any document, written, recorded, digital or otherwise, which may contain passwords, encryption keys, or any other information related to access of computers, storage systems, etc.

9.      Any document, email, letter, note, correspondence, electronic file, chart, written, recorded, digital or otherwise, which may contain notes, records, scientific tests/analysis findings, invoices, financial records, ownership, or sources of or related to this distribution of controlled substance.

10.     Computer systems and peripherals, to include:

    a.  Computers and connected peripherals, cellular telephones, electronic media devices (including storage devices such as USB drives, CDs, DVD, Zip drives, thumb drives, external and internal hard disks, etc.), printers and devices utilized to print shipping labels, laboratory equipment including mass spectrometers, analyzers, and other analysis equipment

    b.  All computer hardware used to commit, further, or facilitate any violation of the offenses cited above, including any and all electronic storage devices or electronic equipment capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.  Included within the definition of computer hardware is any data processing hardware (such as central processing units and self-contained laptop or notebook computers and smartphones); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk

2

drives and diskettes, tape drives and tapes, optical and compact disk storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone generating devices); and any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

c. All computer software used to commit, further, or facilitate any violation of the offenses cited above, including any and all information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components. Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

d. All computer software designed, intended, or that can be used to delete, eliminate, encrypt, hide, or obscure any records on any computer hardware device or equipment.

11.     For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying the individual(s) who owned, used, possessed, accessed, or controlled the hardware device at the time the events described in the affidavit

3

attached, including but not limited to any logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail contacts, communications and correspondence (including but not limited to e-mail, chat, and instant messaging), and photographs.

12.     For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying any electronic storage device or equipment that was attached or connected by any means or manner to the hardware device.

13.     All computer-related documentation, meaning any written, recorded, printed, or electronically-stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

14.     All passwords and data security devices, meaning any devices, programs, or data - - whether themselves in the nature of hardware or software -- that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records.  Such items include, but are not limited to, data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

The term "record," as used above, means any document, information, data, or material, including that used to facilitate interstate communications, in whatever form and by whatever means such document, information, data, or material, its drafts or modifications, may have been created or stored, including, but not limited to, any hand-made form (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, video tapes, motion pictures or photocopies); any

4

mechanical form (such as photographic records, printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact disks); or any data or information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical disks, printer buffers, sort cards, memory calculators, electronic dialers, or electronic notebooks), as well as printouts or readouts from any magnetic storage device, including any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding.